UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **No. CR 16-0411 VC** |
| | ) | |
| NAUM MORGOVSKY; IRINA MORGOVSKY. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | San Francisco, California |
| | | Wednesday, November 8, 2017 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          Brian J. Stretch
                        United States Attorney
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                  BY:   **COLIN C. SAMPSON, AUSA**
                        **JOHN H. HEMANN, AUSA**

                        U.S. Attorneys' Office
                        Oakland Branch
                        1301 Clay Street, #340S
                        Oakland, California 94612
                  BY:   **ERIN A. CORNELL, AUSA**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
               Official Reporter - U.S. District Court

**APPEARANCES (CONTINUED):**

For the Plaintiff:        National Security Division
                          600 E. Street, NW
                          BICN Building, Suite 10606
                          Washington, DC 20530
                  BY:     **JASON MCCULLOUGH, ATTORNEY**
                          **NATHAN M.F. CHARLES, ATTORNEY**


For Defendant            LAW OFFICES OF WILLIAM OSTERHOUDT
Naum Morgovsky:          135 Belvedere Street
                         San Francisco, California 94117
                  BY:    **WILLIAM L. OSTERHOUDT, ESQUIRE**
                         **FRANK S. MOORE, ESQUIRE**


For Defendant            LAW OFFICES OF DORON WEINBERG
Irina Morgovsky:         523 Octavia Street
                         San Francisco, California 94102
                  BY:    **DORON WEINBERG, ESQUIRE**

| | |
|---|---|
| 1 | **Wednesday - November 8, 2017**        **3:12 p.m.** |

**P R O C E E D I N G S**

**---oOo---**

    **THE CLERK:** Calling case CR 16-411, United States versus a Naum Morgovsky and Irina Morgovsky.

    **MR. SAMPSON:** Good afternoon, Your Honor. Colin Sampson for the United States. Additionally, with me are John Hemann, Erin Cornell, AUSAs, and Nathan Charles and Jason McCullough from the National Security Division.

    **THE COURT:** Sorry I kept you all waiting.

    **MR. SAMPSON:** That's all right, Your Honor.

    **MR. OSTERHOUDT:** Pretty formidable.

    **THE COURT:** I don't know. This is a pretty intimidating crew on this side.

    (Laughter)

    **MR. OSTERHOUDT:** Your Honor, William Osterhoudt and Frank Moore for Mr. Morgovsky, who is present.

    **THE COURT:** Hello.

    **THE DEFENDANT:** Naum Morgovsky.

    **THE COURT:** Hello.

    **MR. WEINBERG:** Good afternoon, Your Honor. Doron Weinberg for Irina Morgovsky, who is present.

    **THE COURT:** Hello.

    Okay. So let's see. We need to talk about the motions to suppress and then Mrs. Morgovsky's motion to sever count -- the

1  passport count.  What was that, Count Six?

2          **MR. SAMPSON:**  Yes, Your Honor.

3          **THE COURT:**  And then, I believe, it's Mrs. Morgovsky

4  or is it both parties' motion to sever the --

5          **MR. WEINBERG:**  The defendant -- it's Ms. Morgovsky's

6  motion, Your Honor.

7          **THE COURT:**  This is Mrs. Morgovsky's motion to sever

8  her --

9          **MR. WEINBERG:**  Correct.

10          **THE COURT:**  -- from her husband --

11          **MR. OSTERHOUDT:**  Yes.

12          **THE COURT:**  -- on Count Nine.

13          **MR. WEINBERG:**  Correct.

14          **THE COURT:**  Because Count Nine is the only one -- the

15  only count in which she is named, other than Count Six.

16          **MR. WEINBERG:**  Correct.

17          **MR. OSTERHOUDT:**  Yes, Your Honor.

18          **THE COURT:**  So the idea would be that we would have a

19  trial on the bank fraud, relating to the Hawaii property, as

20  one trial.  We would have a trial against Mr. Morgovsky on the

21  export-related counts.  That's two trials.  Trial against

22  Mrs. Morgovsky on the passport count.  And the trial against

23  Mrs. Morgovsky on the export count, Count Nine; right?  Four

24  trials?

25          **MR. WEINBERG:**  That would be the potential, Your

Honor.

        **THE COURT:**  You might be right.  I mean, you know, I
think -- I think you might be right.

    I'm not sure what is the best thing to start with.  I'm
thinking maybe the motions to suppress.  Because I will tell
you that I've read the affidavit.  It seems very clearly to
establish probable cause against both defendants and seems very
clearly to justify the searches of both the storage -- whatever
it's called, storage container.

        **MR. WEINBERG:**  Storage locker.

        **THE COURT:**  Storage locker and the house as to both
defendants.  And that is true even if you don't read the
sentences that Mr. Morgovsky's motion takes issue with.

    I actually went through the -- to this day, I have not
read those sentences.  I have -- I asked my law clerk to flag
them.  And I went through the affidavit without ever looking at
those sentences.  I have not read them.

    And I don't -- I guess I just don't understand the
argument for suppression.  Like, it doesn't even strike me as a
close question.  But I'll give each of you one more chance to
articulate your argument for why you think the evidence should
be suppressed.

        **MR. OSTERHOUDT:**  I appreciate that, Your Honor.

    On Mr. Morgovsky's behalf --

        **MR. WEINBERG:**  May I ask the Court if the defendants

1  could sit?

2      **THE COURT:**  Oh, my goodness.  Of course, yes.

3      **MR. OSTERHOUDT:**  Your Honor, in our view, it's more

4  than sentences.  There are allegations.  There are whole chunks

5  of the affidavit that contain substantive allegations that are

6  not accurate.

7      **THE COURT:**  I didn't even read the ones that you claim

8  are not accurate.  I didn't even read them.

9      **MR. OSTERHOUDT:**  For example, I mean, I certainly

10  accept that, Your Honor.  And I appreciate it, your taking the

11  trouble to do that.

12      The thing is that, for example, in one instance we have

13  the allegation that's kind of central, really, that he was

14  trying to order from a place called Janos Technology.  He was

15  ordering -- he was contemplating ordering lenses.  The

16  allegation is that they could be then integrated with the FLIR

17  cores and be --

18      **THE COURT:**  I didn't read that.  I didn't read that

19  part.  So you -- you have to stop focusing on the things you

20  think are inaccurate, and explain to me why the parts of the

21  affidavit that you didn't object to as inaccurate do not

22  establish probable cause.

23      **MR. OSTERHOUDT:**  They don't establish probable cause

24  because they don't show that he did anything unlawful.  They

25  show a lot of suppositions by the affiant, but it doesn't show

that he actually exported anything illegally to Russia, to Intratek, or anyplace else.

I don't see where there's any sign of criminality on his part except for these allegations that Your Honor has excluded or not considered.

If you take those away, you have a man that's in the night vision business; has been for years.  He's ordering things both controlled and noncontrolled, which is legal, domestically.  He is sending, periodically, something to Russia, to Intratek, and other places which are unspecified, but are not shown to contain controlled night vision equipment or any other arms control equipment.

So there just isn't any sign, to me, reading the affidavit -- if you take away what we say is false and misleading, I don't see anything that's left there that really shows probable cause that he did anything wrong or, perhaps more significantly, that evidence of that is going to be found in his house or that storage locker.

For example, the warrant for the -- Your Honor is focusing on probable cause quite properly.  But we also attack the overbreadth of the warrant.  And, I think, in that connection, we have numerous cases, *Leary*, in the Tenth Circuit, is an important one, there's *Cardwell* in our Circuit, and *Spilotro*, all say that just to recite statutes that were allegedly violated and say evidence of that will be found won't cut it

1    and won't --

2         THE COURT:  But that's not what the affidavit did.  I

3    mean, the affidavit begins by describing a call they received

4    from Transwestern Sales in Las Vegas, saying that they got a

5    request from Irina Morgovsky to purchase export-restricted

6    night vision equipment.  And she said that she was the owner of

7    High-tech, located at 751 Laurel Street -- by the way, what is

8    751 Laurel Street?  Who lives there?

9         MR. OSTERHOUDT:  It's not an ongoing business.  I

10   agree with you there.

11        THE COURT:  Okay.  So she said she is an owner of the

12   business located at -- who lives there?  Is it, like, her

13   father or something like that?

14        MR. OSTERHOUDT:  That's an address associated with the

15   business.  But it doesn't -- it never --

16        THE COURT:  Associated with the business how?

17        MR. OSTERHOUDT:  It takes --

18        THE COURT:  Who lives there?

19        MR. OSTERHOUDT:  -- correspondence.

20        THE COURT:  Who lives there?

21        MR. OSTERHOUDT:  That particular one is a mailing

22   address.  That's a mailing address.  Nobody lives there.

23        THE COURT:  Okay.

24        MR. OSTERHOUDT:  Nobody lives there.

25        But so what if this guy at that company thought there was

1  something odd about that?  He could have called Mr. Morgovsky,

2  who has been in business for --

3      **THE COURT:**  Yeah, or they could have done an

4  investigation and found out that they had a P.O. Box, and they

5  had a fake address, and they were operating this business out

6  of their house, and they didn't pay any -- they weren't paying

7  their taxes, and they were storing a bunch of stuff in this

8  storage locker under a fake name.  And they could have

9  conducted an investigation and started discovering this very

10  shady activity.  And they could have executed a warrant to

11  search the premises.

12      **MR. OSTERHOUDT:**  My point here, Your Honor --

13      **THE COURT:**  That is one option, to contact

14  Mr. Morgovsky and ask him if he's engaged in an illegal arms

15  export business.

16      **MR. OSTERHOUDT:**  Let's back up for a minute.  Another

17  option would be to check him out and see if he's really

18  established in the night vision business.  He says in his

19  declaration he's been called the grandfather of it, you know.

20  And so there's ways for them to find out.

21      The mere fact that this person said he never heard of

22  Irina Morgovsky, I don't think that's probable cause of

23  criminality.  And, like Your Honor said, he didn't do these

24  other things, so the affidavit doesn't contain that -- those

25  circumstances.

1      What did he do to violate the Arms Export Control Act, as

2  distinguished from the affiant engaging in suppositions that

3  Your Honor is not considering?  I don't see that he did

4  anything that they show that he actually did.

5      And I think that when I was referring a minute to the

6  general nature, I should have specified, I'm talking about the

7  warrant that was issued on that affidavit, which specifies a

8  bunch of statutes, mainly commerce and, you know, Arms Act

9  Control statutes, and then says that they're going to find

10 evidence of violations of that at the house and in the storage

11 locker.  But there's no evidence of that nexus, that I could

12 see.  And that is like *Leary* and *Cardwell*.  Because in those

13 cases, too, the warrant did not explain that nexus, so that you

14 can see that it's -- that's what makes it a general warrant.

15     And, also, the warrant in this case, it does contain other

16 objects of the search that was contemplated, which consists

17 mainly of what you would expect to find, I guess, in any

18 export-related company.  Documents.  But it doesn't aim at

19 anything.

20     I mean, the affidavit contains allegations, some of which

21 Your Honor is not considering now.  But those -- they weren't

22 seeking, expressly at least, evidence of those violations.

23 They just said all of these papers and documents, the house we

24 want to search and seize what we want, without meaningful

25 limitation.  That's my argument on that.

1     **THE COURT:**  Okay.

2     **MR. OSTERHOUDT:**  On the affidavits, as I say, I -- I

3  think that it was incumbent upon the government to authorize

4  the search of this breadth, to justify with concrete

5  allegations of -- factual allegations of wrongdoing, and not

6  just suggestions that things seemed strange.  You could say

7  that, but I don't think that we have that in this case.

8     **THE COURT:**  No, I agree, we don't just have an

9  affidavit that says "things seem strange."  I agree with you.

10  I think we have quite a bit more detail than that.

11     **MR. OSTERHOUDT:**  But is the detail significant?  I

12  know Your Honor has excluded things that we objected to.  But

13  without it, what really is left?  I don't --

14     **THE COURT:**  Probable cause to believe that they're

15  illegally exporting arms.

16     Does Mrs. Morgovsky's counsel have anything to add on this

17  or -- with respect to her specific?

18     **MR. WEINBERG:**  Well, she's joined in this motion, and

19  she made an additional motion with respect to the ladies -- her

20  wallet was taken.

21     **THE COURT:**  Yeah.  Do you want to make any further

22  argument on that?

23     **MR. WEINBERG:**  I do want to say that, presumably, the

24  ladies wallet was seized because the search warrant said that

25  it authorized search for identification documents and evidence

1  of identity theft by Irina Morgovsky.

2      **THE COURT:**  Maybe.  Or it could have been -- I mean,

3  it could have been any number of things; right?  It could have

4  been evidence of illegal exportation of arms.  I mean, it could

5  have been any number of things, right, that -- where it was

6  appropriate to seize and search that.

7      **MR. WEINBERG:**  The wallet, which was plainly a woman's

8  wallet --

9      **THE COURT:**  Yeah --

10      **MR. WEINBERG:**  -- was seized --

11      **THE COURT:**  -- and the affidavit plainly establishes

12  probable cause that she was involved in exporting arms

13  illegally.

14      **MR. WEINBERG:**  With all respect --

15      **THE COURT:**  Probable cause.

16      **MR. WEINBERG:**  With all respect, I disagree with the

17  Court.  And there's certainly no evidence of any kind, no

18  suggestion of any kind, that she was involved in use of false

19  identity, identity theft or anything.  Not a word.

20      **THE COURT:**  Why does that matter?  This warrant was to

21  search for evidence of a lot of different crimes; right?  Tax

22  evasion.

23      **MR. WEINBERG:**  Well, then what the Court is saying is

24  that it's a general warrant that allows the seizure of

25  everything, and then you can take it with you to a warehouse

1  and look and see what you've got.

2        **THE COURT:** No.

3        **MR. WEINBERG:** At the time you seize an object, you

4  have to have some authorization by the warrant, by a warrant

5  that sets reasonable limits. You can't read the warrant to

6  say, well, they could have been looking for this or they could

7  have been looking for that. Something could be found anywhere.

8  There has to be a basis --

9        **THE COURT:** Right. But they were authorized to search

10  for evidence of a number of different crimes.

11        **MR. WEINBERG:** Right. And if you told me --

12        **THE COURT:** And any number of them there might have

13  been evidence of those crimes in a woman's handbag in that

14  storage locker that was rented under a false name.

15        **MR. WEINBERG:** Well, if the Court were to -- if the

16  Court was taking the position that there was probable cause for

17  her involvement in identity theft provided in that affidavit --

18        **THE COURT:** Why does it have to be probable cause for

19  identity theft? I don't understand that.

20        **MR. WEINBERG:** Because why else would you seize the

21  wallet? If you're not giving the officers, basically, carte

22  blanche, they can take anything because it might be evidence of

23  guilt. That is a general warrant. That is a warrant that

24  cannot stand. A reading of this warrant that says go in there

25  and take everything because you never know what might be

1  evidence is a warrant that cannot survive.  It's *Spilotro*, *Kow*,

2  many, many other cases.

3          THE COURT:  Okay.  I understand.

4          MR. WEINBERG:  That's the fundamental principle.  The

5  warrant cannot leave anything to the discretion of the

6  officers.  It has to tell them what they can seize and what

7  they can't seize.  And it is not, with all respect to the

8  Court, a sufficient basis --

9          THE COURT:  It doesn't have to say, if you find a

10  purse, you can search a purse.  I mean, that's not what a

11  warrant does.

12          MR. WEINBERG:  What limitation is there in this

13  warrant keeping them from taking anything in that storage

14  locker?

15          THE COURT:  Oh, I think the warrant probably justifies

16  searching every little crevice of the storage locker because

17  there was evidence that the defendants were engaged in a number

18  of crimes, and they rented the storage -- and they were

19  operating the business out of their home, and they rented a

20  storage locker under a false name.  And so I think you can

21  search everything in that storage locker under these

22  circumstances.

23          MR. WEINBERG:  Well, I'm surprised by the Court's

24  ruling.

25          THE COURT:  I don't know that we can search everything

in their house.  I don't see why -- I don't understand why you wouldn't be able to search anything in the storage locker under those circumstances --

**MR. WEINBERG:**  Because --

**THE COURT:**  -- when it's rented under a fake name.

**MR. WEINBERG:**  The rule of law is that unless an entity is pervaded by crime, by criminality, you can't search everything without limitation.  You can only search everything without limitation if a showing has been made that the place or the entity is pervasively involved --

**THE COURT:**  Is there any reason to believe that there would be anything unrelated to their criminal activity in that storage room?

**MR. WEINBERG:**  I'm going to say, with all respect again, with all respect, that turns the issue on its head.

"Is there any reason to believe they're doing anything legal?" is not the right question.  The question is, has the affidavit --

(Unreportable simultaneous colloquy.)

**THE COURT:**  In the storage locker.

**MR. WEINBERG:**  They're not doing anything but --

**THE COURT:**  Not in their home.  In the storage locker that they rented with a fake name.

**MR. WEINBERG:**  People keep, you know, important papers, important valuable objects, all kinds of things in a

storage locker.  And it's not correct, I think, with all

respect, to say, what proof is there that they were doing

something legal?

The burden is on the affiant and on the affidavit to

establish that they were doing only illegal things and,

therefore, it was appropriate to take everything.

That's -- that's the problem with this search warrant.  It

says take everything.  And the Court has correctly read it that

way.  The Court has said, they could have taken anything

because you never know what you can find somewhere.  Because,

in fact, the affidavit and the warrant do not give enough

guidance and enough limitation, and it's --

**THE COURT:**  Okay.  I understand your argument.  I

understand your argument.

**MR. OSTERHOUDT:**  Your Honor, I'm sorry, I didn't mean

to interrupt.  But with respect to their home, too, there's no

meaningful limitation.  There's broad categories associated

with statutes.  There's no real meaningful limitation to the

search of the house.  They can take anything.  And they did

cart away an enormous amount of stuff.  And I think that's a

general warrant, and I urge you to reconsider that and accept

that that's the fact.

And I also would like to specify that, in this case, you

know, using a fake name, there's authority in the Circuit and

in this very court, *Broadhurst* in the Ninth Circuit, and

*Alvarez*, a Judge Chen case in this court, that it actually

enhances a person's expectation of privacy.

There's nothing wrong with using -- they didn't show it's

a stolen identity.  Although, the prosecutor referred to it in

that way in his reply, in his opposition papers.  There's no

showing it's a stolen identity.  He used a false name, so he

was going to maintain his privacy.  That's all that means.

It's not something to be taken against him.

THE COURT:  Okay.  I understand your argument.

MR. OSTERHOUDT:  Finally, did you credit the informer?

Because we say that in the search warrant and the affidavit

he's not worthy of credit.  He said something --

THE COURT:  I'm not remembering reading anything about

the informer.  What page are you talking about?  What paragraph

in the affidavit?

MR. OSTERHOUDT:  I'm sorry, Your Honor.

Your Honor, I'm sorry, I have to find that.  Let me

briefly say what it says, then I'll find that.

What it says, that there was an informant that provided,

they say, them with a core.  And, you know, that core had a

serial number allegedly scratched off it in Russia.  And they

took it and showed a picture of it to somebody at Clear, who

said, you know, that's a Clear product.  And then we have

evidence on our side that they sell these products, Clear

products, in Russia, having nothing to do with the defendant.

1    **THE COURT:**  I'm pretty sure you objected to that --

2    **MR. OSTERHOUDT:**  We did.

3    **THE COURT:**  -- in your -- yeah.

4    **MR. OSTERHOUDT:**  And I would --

5    **THE COURT:**  I think I didn't -- that's not sounding

6    familiar to me, so I don't think I read that.

7    **MR. OSTERHOUDT:**  I'm sorry, I'm just trying to

8    ascertain what you did rely on and --

9    **THE COURT:**  I didn't rely on anything that you

10   contended was inaccurate in your brief.

11   **MR. OSTERHOUDT:**  Okay.

12   **THE COURT:**  Okay.  All right.  Let's turn, now, to --

13   we're done on the suppression motion.  So let's turn, now, to

14   severance.  Let me turn, maybe first, to the government.

15   I guess I should check with the court reporter.  Could

16   you -- could anybody use a break?  Let's take a 10-minute

17   break.  We'll resume at quarter to 4:00.

18   **MR. OSTERHOUDT:**  Thank you, Your Honor.

19   (Recess taken at 3:33 p.m.)

20   (Proceedings resumed at 3:46 p.m.)

21   **THE COURT:**  Okay.  On severance, Count Six, let's talk

22   about Count Six first.

23   **MR. WEINBERG:**  Do you want to hear from the moving

24   party or from the government?

25   **THE COURT:**  From the government, because I'm pulling

1    it up right now.  But let's see.  Motion to sever.

2         **MR. SAMPSON:**  Document 105, Your Honor.

3         **THE COURT:**  Hold on one second here.  What I am

4    pulling up -- there are so many documents in this case, it's

5    hard to find all of them.

6         But what I was trying to pull up was that -- oh, wait.

7    Here it is.  Sorry.  There we go.  *Jawara* is what I was trying

8    to pull up.

9         After reading *Jawara*, I guess I don't understand how --

10   and after reading the indictment, I guess I don't understand

11   how Count Six can be part of the same indictment as Count Nine.

12   I'm sure there is a good factual explanation that would justify

13   them being in the same counts.  I'm sure -- in the same

14   indictment.  I'm sure there's a good evidentiary basis for them

15   being in the same indictment.

16        And, frankly, I'm not sure why the Ninth Circuit -- I'm

17   not sure I understand the Ninth Circuit's reasoning for

18   insisting that you are limited to reviewing the face of the

19   indictment.  I'm not sure what purpose that serves.  But that

20   is the -- that is what the Ninth Circuit has said.

21        And given that we're limited to the face of the

22   indictment, I don't understand how we could conclude that Count

23   Six could be tried together with Count Nine.

24        **MR. SAMPSON:**  Respectfully, Your Honor, I believe that

25   the standard is that the similarities be reasonably inferred

from the indictment.

**THE COURT:**  Right.

**MR. SAMPSON:**  I believe under *Ford* it does not have to be specifically pled, but there has to be a factual basis. There is one.  I'm happy to go into it, Your Honor.  But I don't believe --

**THE COURT:**  Show me the language in the indictment, and show me what the inference is that can be drawn from that language.

**MR. SAMPSON:**  Well, Your Honor, the issue is that for the passport charge it carries a ten year statute of limitations, and the Count Nine carries a five.  If Count Nine carried a ten, the government would very likely allege and be able to prove that for that whole period of time, indeed, maybe to the '90s, the Morgovskys were involved in the export of controlled technology.

**THE COURT:**  What does that have to do with inferring from the indictment that Count Six and Count Nine are related?

**MR. SAMPSON:**  Well, Your Honor, I think that, like other indictments that come out, there can be -- they are written in sparse language.  And they allege the elements of the crime.  I don't believe that there needs to be a manner and means section that specifically relates the counts.  If I'm wrong --

**THE COURT:**  I'm asking you a pretty direct question.

1      **MR. SAMPSON:**  Yes.

2      **THE COURT:**  Show me the language in the indictment

3  from which I can infer that the two counts are related in the

4  way that Rule 8 requires them to be related.  I'm quite

5  confident that they are related as a factual and evidentiary

6  matter, but that is not the test.

7      **MR. SAMPSON:**  Yes, Your Honor.

8      The indictment goes into pretty great detail, before Count

9  Nine, about the conspiracy to export items to Russia and the

10  ways in which they were -- ways in which they were done.

11      And it also goes into the Count Ten, which is a

12  concealment of the proceeds of specified unlawful activity

13  using -- concealing the source, which was done using the Gary

14  Piper identity.

15      That's not the Victoria Ferrara identity.  But I would

16  submit to Your Honor that there are sufficient relation between

17  the arms export conspiracy, which involved concealing things

18  and mislabeling things for export to Russia, and the Count Six,

19  which indicates that Mrs. Morgovsky was using the identity to

20  travel to Russia.

21      **THE COURT:**  When you say "the identity."

22      **MR. SAMPSON:**  The Victoria Ferrara passport, Your

23  Honor, yes.

24      **THE COURT:**  So what we know from the indictment, from

25  looking at the indictment, is from August 10th, 2007, until at

least November 29th, 2007, she willfully and knowingly used this passport to travel to Russia.

      **MR. SAMPSON:**  Yes, Your Honor.

      **THE COURT:**  That's what we know about Count Six.

      **MR. SAMPSON:**  Correct.

      **THE COURT:**  Show me some language in the indictment that relates back to that.

      **MR. SAMPSON:**  So, Your Honor, paragraph 35.  Naum and Irina Morgovsky own a number of sole proprietorships.  Naum Morgovsky owns a business in Russia.  And there was a co-conspirator in Russia that worked for the night vision business.

      **THE COURT:**  Okay.

      **MR. SAMPSON:**  And we allege in the indictment, from not time immemorial but sometime prior to five years ago and until 2016, there were communications between the Morgovskys and Russia, individuals in Russia, to ship night vision technology to Russia.

      **THE COURT:**  Right.

      **MR. SAMPSON:**  And so the relationship is --

      **THE COURT:**  Russia.

      **MR. SAMPSON:**  The Russia connection.

      **THE COURT:**  The Russia connection.

      **MR. SAMPSON:**  Yes, Your Honor.

      **THE COURT:**  All right.  Okay.

1    **MR. SAMPSON:**  We believe that's enough.  I don't have

2    more argument than that.  I'm sorry.

3        **MR. WEINBERG:**  May I comment, Your Honor?

4        **THE COURT:**  It's not necessary.

5    Okay.  So I have no choice but to -- I think that courts

6    should be able to consider evidence in assessing this, but

7    that's not the rule in the Ninth Circuit; and, therefore, I

8    don't think I have any choice but to sever Count Six.

9        So that leaves us with the motion by Mrs. Morgovsky to

10   sever her trial on Count Nine from Mr. Morgovsky's trial on

11   Counts --

12       **MR. WEINBERG:**  On Nine, Ten, Eleven.

13       **THE COURT:**  -- on Counts Nine, Ten, and Eleven.

14   And on that it is -- I guess my view on that is that, you

15   know, you have to -- you know, there's this argument that

16   Mr. Morgovsky would testify on her behalf if there was a --

17   if -- or an assertion that Mr. Morgovsky would testify on her

18   behalf if there were separate trials.  And I'm assuming, then,

19   that the idea would be that Mr. Morgovsky's trial goes first

20   and her trial goes second?

21       **MR. WEINBERG:**  I don't think we can control that, Your

22   Honor.  I think all our motion can be is to separate the

23   trials.  I think the government and the Court have a role in

24   determining which goes when.

25       **THE COURT:**  Okay.  And there are a lot of things for

1   me to consider and weigh in deciding whether it is fair for the

2   two alleged co-conspirators to be tried together or whether

3   they should be tried separately.  And it seems like a lot of it

4   has to do with the -- like, the quality of the remaining

5   evidence against the -- you know, the person who's moving for a

6   separate trial.

7        And I haven't -- I don't really have a great grip on what

8   the quality of the remaining evidence is.  So why -- why isn't

9   the answer -- what I have read is the affidavit; right?  And

10  the affidavit suggests that there's some pretty strong evidence

11  against Mrs. Morgovsky with respect to her intentional --

12  alleged intentional violation of this statute.  But that's just

13  an affidavit.  We don't know what the evidence -- what's going

14  to come in; right?

15       Why isn't the answer for me, at this point, to deny the

16  motion without prejudice to renewal at the close of the

17  government's case?

18            **MR. WEINBERG:**  Well, I think that you have more than

19  the affidavit to judge on, Your Honor.

20       (Court reporter does not hear comment made by

21  Mr. Osterhoudt.)

22            **THE COURT:**  I heard what you just asked.  You asked

23  about double jeopardy.  I asked about that too.  But,

24  apparently, the law provides that that is how it's often

25  supposed to work, and that it doesn't -- by implication, does

1    not create a double jeopardy problem.  I mean, I want everybody

2    to, like, research that and make sure about that.

3         And I had this, I had a trial where there were two

4    co-conspirators and I denied without prejudice the motion to

5    sever.  And at the close of the government's case, one of the

6    defendants renewed his motion and said, now that the evidence

7    has come in, it's clear that we cannot have a fair trial if

8    we're tried together.

9         And so the idea was that the party moving to sever would

10   be broken off, and there would be another jury and another

11   trial for them.  I think.

12        I want everybody to look at that carefully.

13        But why -- assuming that doesn't create a double jeopardy

14   problem, why isn't that the best approach in this case?

15        **MR. WEINBERG:**  Well, because I think the Court has

16   enough now to make -- the structure that the Court is

17   suggesting may be permissible.  I haven't researched it.  But

18   it's obviously cumbersome and puts Mrs. Morgovsky in a

19   situation of having a whole lot of evidence brought in against

20   her husband that bleeds off on her and taints the jury's view

21   of her.

22        **THE COURT:**  Wait.  That, in itself, is not a reason to

23   sever.

24        **MR. WEINBERG:**  I understand.  But I'm saying that is a

25   problem.  We have made a presentation to the Court that is

sworn and specific.  That is, Naum Morgovsky will testify, and he will provide evidence, firsthand evidence, that Mrs. Morgovsky was not knowingly involved in the details of the business.  I'll get back to that in a minute.

The government responds and proves our point.  At page 8 of the government's response, they set out what the evidence is that they believe they possess to suggest that Ms. Morgovsky was knowingly involved.

And what you'll see is, she had contact with people and she filled orders and she sent things and she wrote things. Nothing that says that she conspired.  That's a specific intent crime --

THE COURT:  Didn't she -- on several years, didn't she -- according to the affidavit, she filled out acknowledgments that she was purchasing --

MR. WEINBERG:  And the testimony is going to be that she did what her husband told her to do; that she had no knowledge --

THE COURT:  But she signed acknowledgments that she was ordering restricted night vision goggles; right?

MR. WEINBERG:  And what Mr. Morgovsky will say, and what he said in his affidavit, is that he frequently signed her name to documents without her approval, without checking with her.  He will say that.

Whatever difficulty that may put him in, he has provided a

sworn declaration already and indicated to the Court that he
will testify that he freely used her signature and he had a
signature stamp, and that she was not knowingly involved in
understanding that some things were controlled and some things
were not and that she was potentially working with controlled
things.  She did not know that.  She had no knowledge of it.

      **THE COURT:**  Can't she testify, "I never signed these
things"?

        **MR. WEINBERG:**  Well, she does --

      **THE COURT:**  "He must have signed them."

      **MR. WEINBERG:**  Number one, I don't think that the
government can put the defendant in a situation where she has
to give up her Fifth Amendment rights in order to defend
herself.

      **THE COURT:**  But a defendant can't use her Fifth
Amendment rights as a sword as opposed to a shield.

        **MR. WEINBERG:**  I understand that but --

      **THE COURT:**  It sounds like where you're going is that
she would be using her right to invoke as kind of a sword to
allow severance of the defendants.

      **MR. WEINBERG:**  But there's a more -- there's a more
direct answer.  And that is, if a defendant gets up without any
corroboration and says, I didn't know what I was doing, I just
did what my husband told me, what's the first thing the jury is
going to say?  So, where's the husband?  Where's the husband?

1    Who's going to believe a defendant who said, I was just

2  doing something somebody told me to do, and I didn't know.

3  It's worthless testimony.  It's only if Mr. Morgovsky comes in

4  and says, Here's what happened; here's what I did.

5      **THE COURT:**  That is a fair point.  But the question

6  is, how important -- how significant is Mr. Morgovsky's

7  anticipated testimony on her behalf in the grand scheme of

8  things?

9      And the grand scheme of things is something that I'm not

10  terribly familiar with yet.  All I've done is, I've read the

11  affidavit and I've read the papers.  But I haven't seen what

12  the testimony is going to be.  I haven't seen all the

13  documentary evidence that's going to come in, the emails.  All

14  that stuff.

15      So it just seems like I would be in a much better position

16  to evaluate your argument after the evidence comes in.

17      **MR. WEINBERG:**  Don't you think you would have been in

18  a much better position if the government had said, Here's the

19  evidence we have?  They didn't.  What they said is in one

20  paragraph; we have some evidence.  And what they told you in

21  that one paragraph is that she signed things and wrote things.

22  Period.  That's already answered in the declaration.

23      You know all you need to know, because if the government

24  had more they would have told you.  If the government had

25  somebody that was going to come in and say, I dealt with

Ms. Morgovsky and she was knowledgeable, or if they said, here's a letter in her hand --

THE COURT: She doesn't have to be knowledgeable about all the technical aspects of it. She just has to know she's violating the law. She has to know she's participating in the exportation of a product that is --

MR. WEINBERG: Absolutely.

THE COURT: -- that is on that list.

MR. WEINBERG: But she has to have the intention, specific intent to violate the law. That is, she has to know that what she is working with is export controlled; and notwithstanding knowing that it's export controlled, she goes ahead and participates in exporting it.

There's no evidence in any of paragraph 8, or anything that the government has, that says she knew that these things were export controlled. All the government has is --

THE COURT: She signed those acknowledgments.

MR. WEINBERG: And Mr. Morgovsky has given you a sworn declaration that says, I signed her signature. I freely used her signature. And, you know, he's going to say --

THE COURT: Well, let's see what the handwriting expert says about that at trial; right? I mean, let's see what -- I haven't seen the signatures.

MR. WEINBERG: First of all, much of it is a stamp.

THE COURT: I don't know anything about -- let's see

what the electronic -- let's see what the electronic footprints say about that.

That's my point. I don't know -- I don't have any ability to assess whether, you know, that testimony would play, you know, a significant role in a trial by -- you know, of Mrs. Morgovsky, if she had a separate trial, or if it would just be laughed out of the building because of the mountain of other evidence that proves that his declaration is false?

**MR. WEINBERG:** But, Your Honor, if the government had that mountain of other evidence, this was the time to tell you that. The point is, the government has a circumstantial case against Ms. Morgovsky: she filed these documents; she wrote things; she must have known. Mr. Morgovsky can tell you specifically and in first person, She didn't know; I signed her name.

And the government argues that she shouldn't -- that we shouldn't be allowed to rely on hearsay such as she wasn't interested in learning the details of the business or she was committed to being a grandmother, et cetera.

Those things are not hearsay. Those are legitimate pieces of evidence from Mr. Morgovsky based on his own knowledge. But, also, it is not hearsay to say, "My wife told me, 'Don't bother me with details.'"

It's not hearsay to say, "My wife was not interested in talking about the specifics of this," or "My wife told me,

'I'll do what you want me to do, but don't bother me with the details because I'm busy with my grandchildren.'"

Those are not hearsay statements. They are not coming in for the truth. They are coming in for intention and state of mind.

Mr. Morgovsky has said that he can testify that she was committed to other things and was just doing this at his demand or his request and without knowledge. You have that.

So you have an exculpatory statement which if the jury believes -- and at this point, you know, we can't say anything other than the jury might believe it. If the jury believes it, it's completely exculpatory.

Against that, the government simply says, well, we have circumstantial evidence. Of course you do. And Ms. Morgovsky is proposed to explain it and put it in its perspective. Which is that Mrs. Morgovsky was simply doing his bidding. She knew nothing about the business. She had no knowledge of what was export controlled and what was not. And, in fact, he frequently signed her name to documents without her knowledge. You have that.

If that testimony is presented to the jury, it is more than sufficient to exculpate her based on this circumstantial evidence. So I don't see that the Court needs more --

THE COURT: I don't know.

MR. WEINBERG: If the Court needed more, it should

1    have gotten it from the government.

2        **THE COURT:**  I'm not sure I even agree with that

3    because I think the affidavit presents a very strong case

4    against Mrs. Morgovsky.

5        But I think the point now is -- you know, the big question

6    now is why I should be deciding it now, not having -- you know,

7    not having all that evidence at my disposal.

8        **MR. SAMPSON:**  Your Honor, I think it is a good

9    strategy to wait.  I don't know that waiting until the end of

10   trial one on Count Nine -- I think maybe the pretrial before

11   the Count Nine trial would probably be the right time to take

12   it up.  But, Your Honor --

13       **THE COURT:**  It could be adjudicated then.  But I think

14   that it could be renewed.  I think the motion could be renewed

15   after the government presents its case.

16       **MR. SAMPSON:**  Perhaps.  I'll have to research when

17   jeopardy -- I think the jeopardy attaches when the jury is

18   sworn in.  I'm not certain we can do it at the end of trial.

19       Your Honor, the declaration needs to be substantially

20   exculpatory.  The defense says it's completely exculpatory, but

21   I don't think they quite get there.

22       If -- maybe the motion would be on better footing if

23   Mr. Morgovsky pled guilty, said, "I am guilty.  And, by the

24   way, I lied to my wife that we had an export license."

25       **THE COURT:**  Then there would be no motion to sever --

1        **MR. SAMPSON:** Well, that would be exculpatory, Your

2  Honor.

3        **THE COURT:** -- because Mr. Morgovsky would not be

4  going to trial.

5        **MR. SAMPSON:** Fair enough.

6    But, Your Honor, instead he's saying -- he's very

7  carefully saying things like, "I sometimes used her signature

8  without her authorization."

9    Well, sometimes it sounds like she did actually sign

10  things. We have evidence that things were edited with her

11  computer log-in. And she also was very involved in the

12  finances of the business.

13    And I don't think there's any dispute that she signed a

14  great deal of the checks that were written to pay for this

15  night vision technology.

16    So, Your Honor, I -- the cases discuss mutually

17  inconsistent defenses, and I don't think that's what we have

18  here.

19        **THE COURT:** Well, that's not the only reason to sever

20  a trial.

21        **MR. SAMPSON:** No, Your Honor, but --

22        **THE COURT:** It's not just mutually -- I mean, that's

23  one reason. But that's not the only reason to sever a trial.

24        **MR. SAMPSON:** Understood, Your Honor.

25        **THE COURT:** Sever defendants.

**MR. SAMPSON:** There, again, I don't think Mr. Morgovsky can competently testify, "My wife didn't know X. My wife didn't know X." You know, we have her signature on documents. And the jury can make inferences that it wishes.

But this puts this case directly and squarely under *Trejo-Zambrano*, which is a case that Mr. Weinberg denigrated. But that case rejected a codefendant's declaration that said, "My codefendant didn't know." And the Ninth Circuit said it's irrelevant. And I believe they said it was incompetent testimony.

He can't testify as to what someone else knows or doesn't know. And the government has evidence she knew.

**THE COURT:** Depends on the context.

**MR. WEINBERG:** I think Mr. Sampson has misremembered *Trejo-Zambrano*. The Trejo-Zambrano affidavit said, "My brother was not involved in this crime," and didn't say anything about Trejo-Zambrano.

And Trejo-Zambrano wanted to use the affidavit as evidence in his behalf because it didn't mention him. And the jury was, therefore, supposed to draw the conclusion that he was innocent.

He didn't want -- the brother, Jesus, or whatever his name was, did not want to testify. There was no evidence that he actually had exculpatory testimony from Mr. Trejo-Zambrano. It was all extrapolation by the defendant.

1    This is different.  You have Mr. Morgovsky's declaration

2  that he does have and will provide --

3        THE COURT:  You guys like to rely on cases from the

4  '70s.

5        MR. WEINBERG:  I'm sorry?

6        THE COURT:  You guys like to rely on cases from the

7  1970s.

8        MR. OSTERHOUDT:  Back in the day.

9        MR. WEINBERG:  But, Your Honor, let me make another

10  point.

11    The idea about going to trial together and then seeing

12  what the evidence is, if at the end of trial Mr. Morgovsky were

13  to say -- at the end of the government case Mr. Morgovsky were

14  to say, "Well, I can answer all of that; everything that was

15  testified about her is something that I told her to do or I did

16  for her," what will the Court know that it doesn't know today?

17        THE COURT:  All the other evidence --

18        MR. WEINBERG:  No, that's --

19        THE COURT:  -- that might contradict Mr. Morgovsky's

20  assertion about that.

21        MR. WEINBERG:  But if there's conflicting evidence,

22  the defendant has the right to her side of it.  The Court

23  cannot decide --

24        THE COURT:  That depends, because you're balancing a

25  lot of different interests; right?  The government has a right

1   to -- you know, to proceed against both defendants so long as

2   it doesn't violate their rights.

3      There's this issue of judicial economy which, frankly, as

4   you can tell, I don't care about because I'm granting severance

5   requests left and right.  I think our job is to do trials.  And

6   if we need to do four trials instead of one, that's fine.

7      But there's also this presumption -- there's this

8   presumption, a strong presumption, in favor of trying

9   co-conspirators together.  And to decide whether it would be

10   prejudicial to try -- to try defendants together depends on all

11   the circumstances and all the evidence and, you know, an

12   assessment of how differently things would go if there were a

13   separate trial.  I'm not sure I'm capable of assessing that

14   right now.

15      **MR. WEINBERG:**  I think that, with all respect, once

16   again, the Court's approach --

17      **THE COURT:**  You don't have to say that.

18      **MR. WEINBERG:**  Well, may I just stipulate that I have

19   respect for the Court for all my remarks?

20      **THE COURT:**  You may, but you don't need to have it.

21      **MR. WEINBERG:**  What the Court's approach does is take

22   away the role of the jury.  The Court is inserting itself and

23   saying, well, if the evidence is strong enough, then I'm not

24   going to believe him.

25      **THE COURT:**  That's not what the cases say; right?  The

cases say it's a sort of multifaceted inquiry where you have to take into account all of the interests and you have to assess the effect.

MR. WEINBERG: But the multifaceted inquiry is whether the testimony is exculpatory.

THE COURT: Let me ask you this: If you moved to sever on this grounds and they had video and audio of her in a conversation with somebody else saying, "I know full well that this is illegal and my husband has explained it all to me, and I realize that, but I still do it because I think it's important that we get these weapons to Russia" or "I think it's important that we make this money," or whatever, if there were a video and audio recording of that, should I grant your motion on the ground that Mr. Morgovsky wants to say that she didn't know anything about it?

MR. WEINBERG: There's something missing from that question, Your Honor, and that is discovery. The government's discovery obligation. If there were such a thing, we should have had it by now.

THE COURT: I'm asking you, you seem to be saying that no matter what, no matter what the other evidence is, that his assertion that he would give this testimony requires a severance.

MR. WEINBERG: What I'm saying is different than that, Your Honor. What I'm saying is that the issue is not whether

the government has some other evidence to weigh against this evidence.

If the government had dispositive evidence, we wouldn't have been able to make this motion because we would have fallen flat on our face.

We've had the discovery for months now.  This case has been litigated at great length.  The government has been good about giving --

**THE COURT:**  Part of the problem is that the government has not done a good job of explaining why it wouldn't matter --

**MR. WEINBERG:**  Well, if the government had the kind of evidence that this court is proposing it might have we would know it.  We would not have made this motion.  The government would know it and would have said so to you already.  We wouldn't be sitting here saying, well, maybe at trial something will come out that will be decisive.

If it came out at trial for the first time, the government would be in serious trouble.  If the government has decisive evidence, that should be known to all parties and the judge.

**THE COURT:**  Wait a minute.  The government is obligated to disclose *Brady* material to you.

Is the government, by today, obligated to have disclosed every piece of evidence that it has against your clients?

**MR. WEINBERG:**  Absolutory.  Inculpatory evidence?  Statements by the defendant?

1      **THE COURT:**  Not just statements by the defendant.  All

2 the evidence that the government has against your clients.  Is

3 the government obligated under the rules to disclose that --

4      **MR. WEINBERG:**  If they have --

5      **THE COURT:**  -- now?

6      **MR. WEINBERG:**  If they have a photograph, a

7 tape-recording, a video of Mrs. Morgovsky doing something

8 incriminating --

9      **THE COURT:**  Not Mrs. Morgovsky.  I'm asking you about

10 all the evidence that they have against your clients.

11    Do they -- are they under an obligation today to have

12 disclosed all evidence against your clients?  I don't think so.

13      **MR. WEINBERG:**  Under Rule 16, they have the obligation

14 to provide all physical evidence, all documentary evidence.  So

15 if they have letters that she's written, if they have

16 videotapes, if they have --

17      **THE COURT:**  You keep talking about statements that

18 she's made.

19      **MR. WEINBERG:**  Well, statements that she made.  If

20 they have any statements that she made, that are recorded in

21 any way, whether they are document --

22      **THE COURT:**  Okay.

23      **MR. WEINBERG:**  That's physical evidence --

24      **THE COURT:**  Seems like we're talking past each other.

25      **MR. WEINBERG:**  -- that should have been turned over.

1    There's no way that, at this stage, the government could

2  be withholding some smoking gun where Mrs. Morgovsky is heard

3  to say or seen to say or read to say, "I knew what I was

4  doing."  If they had it, they would have turned it over.  If

5  they had it, they would have told you.

6    **THE COURT:**  I think you misunderstood my question.  I

7  was asking a hypothetical question.

8    **MR. WEINBERG:**  I understand.

9    **THE COURT:**  I'll think about this some more.  And I

10  want people to research this double jeopardy question too.

11    But I think what I'm inclined to do is to deny the motion,

12  you know, without prejudice to renewing it, I guess, maybe at

13  the pretrial conference, with the hope that I will get a better

14  presentation of what the evidence is going to be.

15    **MR. WEINBERG:**  Well --

16    **THE COURT:**  But I think my preference is that if it

17  didn't create a double jeopardy problem, I would just wait

18  until the close of the government's case.

19    **MR. WEINBERG:**  I would ask the Court to approach the

20  matter differently.  I would ask the Court to allow the parties

21  to submit further briefing and for the government to disclose

22  what evidence it has that is direct evidence of

23  Mrs. Morgovsky's knowledge, knowing, intentional involvement.

24    If they have more than what they put in the paragraph on

25  page 8, why wait until pretrial conference?

1        **THE COURT:**  What do you say to that?

2        **MR. SAMPSON:**  Your Honor, we keep producing the things

3 that we have -- that we possess.  There's almost nothing else.

4 I can't think of anything I haven't produced.  This week I

5 gave --

6        **THE COURT:**  What about a presentation to me?

7        **MR. SAMPSON:**  Your Honor, I think it makes sense to

8 table this for a bit.  I think the government does need to

9 research this.  I am not certain that this is about weighing

10 the mountain of evidence here and there.  I think the Court has

11 a lot of discretion here.

12        **THE COURT:**  That's part of it.

13        **MR. SAMPSON:**  And perhaps Mr. Morgovsky -- assuming

14 the government had something else -- which I don't think we

15 do -- is it that the defense is then going to have another

16 declaration to sort of meet that?  I'm not sure.

17    The government, in its response, indicated that there were

18 reasons to disbelieve Mr. Morgovsky's declaration.  And I think

19 we adequately stated those reasons.

20        **THE COURT:**  I think there are very strong reasons to

21 disbelieve Mr. Morgovsky's declaration.  I don't -- I -- you

22 know, like I said, I think there's -- there appears to be a

23 strong case against Mrs. Morgovsky based on -- at least on the

24 affidavit.  But we'll find out at trial.  Or maybe we'll

25 explore it more pretrial.

1    But I do think that -- I do think that what I would like

2    to be able to do is wait until I see the evidence.  But maybe

3    it will just be a matter of waiting until -- denying this

4    until -- without prejudice to renewing at pretrial.

5        When are we going trial?  In which order are we going?

6        **MR. SAMPSON:**  That's a great question, Your Honor.  I

7    do think that the dual jury thing is worth considering, as

8    well, the potential -- there could be a jury impaneled for each

9    defendant, properly instructed, and excused when appropriate.

10       **MR. WEINBERG:**  And I would just mention or say to the

11   Court that I have -- in the course of preparing this motion and

12   responding to the government, I have read every case that

13   involves the request by one defendant to present exculpatory

14   testimony of a codefendant.

15       And I don't believe there's any precedent for the

16   suggestion that the Court is making of going to trial and let's

17   see what happens.

18       **THE COURT:**  Okay.  Like I said, what I lean towards

19   doing is denying it without prejudice to reraising it at the

20   pretrial conference, when I -- when I'm in a position to

21   consider everything in context.  But I will think about it a

22   little more.

23       So what should be the -- which trial should go first?

24       **MR. SAMPSON:**  Well, Your Honor, I think, now we've got

25   two trials, that there's no real impediment to them going

forward. The government is ready to proceed on the bank fraud. We're happy to set a date today. I think maybe it perhaps makes sense to trail the passport trial after that.

THE COURT: Okay. And you've got two trials already. So I assume the passport count we can set that for, like, a time after I'm eligible to retire, so that somebody else can try that case?

MR. SAMPSON: If the Court's unable to hear it.

THE COURT: Okay. That trial will be -- will take place much, much later in time, if necessary, if the government still thinks it's necessary to proceed after we're done with the other two trials or three trials.

MR. OSTERHOUDT: Your Honor, I beg your pardon. Didn't mean to interrupt Your Honor, but we've taken the position, and I think reasonably, that the night vision case should proceed first.

And the reason for that -- there's numerous reasons, but one of them is Mr. Morgovsky's expressed intention to testify at the bank fraud case and related cases but not in his night vision case.

That's the subject of a declaration by him which Your Honor granted the motion to file under seal. The only reason to put it under seal and file it was that that declaration dealt with his -- his desire to do that, to testify in one case and not the other.

The D.C. Circuit has said -- cases we cited for Your Honor -- that in the severance motion, the motion to sever counts, that that's a legitimate reason, you know, to sever and also a legitimate -- obviously, a legitimate reason to order the cases in that manner.

He has taken the position that he's not going to testify -- that's his intention -- in the night vision case. He has good reason why he doesn't intend to testify in the bank fraud case involving Mr. Migdal. And I think that in view of that, to safeguard his Fifth Amendment right to remain silent and not to have his silence used against him in the --

THE COURT: But they are two totally separate trials on two totally separate subject matters that never should have been joined in the same indictment in the first place.

So I don't understand. I mean, if he testifies about the --

MR. OSTERHOUDT: Bank case.

THE COURT: -- bank case then why is that a problem for the next case?

MR. OSTERHOUDT: Well, because we still have hanging out there, at that point, the other case in which he intends not to testify.

And in the course of the -- in the course of defending himself on the bank fraud charges, it's very likely that -- that matters will be disclosed that will endanger his exercise

of privilege.

      **THE COURT:**  Like what?

      **MR. OSTERHOUDT:**  In cross-examination.

   I mean, there are issues that are related to the -- to that case, that if he is forced to testify and cross-examined, he's cross-examined in the bank fraud case, cross-examined about his credibility in various ways, can we guarantee that that won't stray off into the night vision business, his relationship to Russia?

      **THE COURT:**  He's in control of that.  And you can make objections; and I can make rulings.

   I mean, they seem like two totally separate things.  So I don't see why testifying about one would create a problem for the next trial.

      **MR. OSTERHOUDT:**  I think that in the real -- I mean, conceptually, when you think about the reality of it, I think there's a real danger of --

      **THE COURT:**  Okay.  Here's what we're going to do.  I candidly have to go.  I have an appointment at 5:30 that I can't miss.

   So we -- I'm happy to have you file something on which case should go first.

      **MR. OSTERHOUDT:**  All right.

      **THE COURT:**  And why.

      **MR. OSTERHOUDT:**  I will.

1    **THE COURT:**  And I'll consider it.  I don't -- you're

2  going to have to explain with specificity and with examples --

3    **MR. OSTERHOUDT:**  Okay.

4    **THE COURT:**  -- of how you think, you know, it would --

5  it would be a problem for Mr. Morgovsky, because I don't

6  understand what you're talking about.

7    **MR. OSTERHOUDT:**  I'll try to do that, Your Honor.

8    **THE COURT:**  It has to be with specificity and examples

9  how he would be prejudiced unfairly and unconstitutionally.

10    **MR. OSTERHOUDT:**  I'm sure we can do that.

11    **THE COURT:**  Shall we have a further status conference,

12  like in a few weeks, couple of weeks, and you can file

13  something in the meantime, and we can set trial dates at the

14  next conference?

15    **MR. SAMPSON:**  I don't know what Your Honor's calendar

16  looks like, but I think it would make sense to set a holder of

17  a trial date, I think, for the bank fraud case.

18    **THE COURT:**  I'm not going to do that right now.  And I

19  have to go.

20    When are we going to next meet?

21    **MR. SAMPSON:**  Your Honor, we can take this up -- I'm

22  not available the week of Thanksgiving, but I'm available the

23  week before and the week after.

24    **THE COURT:**  How about the week after Thanksgiving, on

25  Tuesday?

1     **MR. SAMPSON:**  Mr. Migdal's sentencing is that date.

2  I'm not sure if it's going to be continued or not, but I will

3  be available.

4          **THE COURT:**  Okay.

5          **MR. WEINBERG:**  I would ask for the week after

6  Thanksgiving.

7          **THE COURT:**  The Tuesday after Thanksgiving?

8          **MR. WEINBERG:**  The Tuesday after Thanksgiving is fine.

9          **MR. OSTERHOUDT:**  Which is what?

10         **MR. WEINBERG:**  Tuesday after Thanksgiving is

11  November 28th.

12         **THE CLERK:**  Yes.

13         **MR. OSTERHOUDT:**  Fine with me, Your Honor.

14         **MR. WEINBERG:**  Fine with me.

15         **THE COURT:**  So November 28th, at 10:30.

16     And in seven days, each side should file a brief

17  explaining the order in which the trial should go -- their view

18  of the order in which the trials should go.  All three parties

19  should file.

20         **MR. WEINBERG:**  And may we also have further briefing

21  on the Court's suggestion for how to resolve this Rule 14

22  issue?

23         **THE COURT:**  You mean --

24         **MR. WEINBERG:**  On whether or not --

25         **THE COURT:**  -- waiting until after the close of the

1   government's case?

2       (Unreportable simultaneous colloquy.)

3          **MR. WEINBERG:** -- the trial --

4         **THE COURT:** Yeah. Why don't you give me your view on

5   whether denying it without prejudice to renewal at the close of

6   the government's case is an appropriate thing to do

7   constitutionally, whether that will create a double jeopardy

8   problem. Okay.

9          **MR. OSTERHOUDT:** Thank you very much Your Honor.

10        **THE COURT:** Thank you.

11        **MR. SAMPSON:** Thank you.

12      (At 4:25 a.m. the proceedings were adjourned.)

13                  - - - -

14

15                **CERTIFICATE OF REPORTER**

16       I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   DATE:   Thursday, November 16, 2017

20

21

22     _____

23      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                  U.S. Court Reporter

24

25