Pages 1 - 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
  vs.                              )  No. CR 16-0411 VC
                                   )
NAUM MORGOVSKY and IRINA           )
MORGOVSKY,                         )
                                   )  San Francisco, California
          Defendants,              )  Thursday
                                   )  May 17, 2018
_____    )  10:00 a.m.

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

**For Plaintiff:**          ALEX TSE
                         United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California  94102
                  BY:  **COLIN SAMPSON**
                       **ERIN CORNELL**
                       **ASSISTANT UNITED STATES ATTORNEYS**


**For Defendant**           LAW OFFICE OF WILLIAM L. OSTERHOUDT
**Naum Morgovsky:**         135 Belvedere Street
                         San Francisco, California 94117
                  BY:  **WILLIAM L. OSTERHOUDT, ESQ.**
                       **FRANK MOORE, ESQ.**


**For Defendant**           LAW OFFICES OF RICHARD MAZER
**Irina Morgovsky:**        99 Divisadero Street
                         San Francisco, California 94117
                  BY:  **RICHARD B. MAZER, ESQ.**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
          *Official Reporter - US District Court*
          *Computerized Transcription By Eclipse*

<u>**Thursday - May 17, 2018**</u>                           <u>**10:06 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---000---**

(Defendants present, out of custody.)

**THE CLERK:**  Calling Case No. 16-CR-00411, USA versus
Naum Morgovsky and versus Irina Morgovsky.

Counsel, please step forward and state your appearances
for the record.

**MR. SAMPSON:**  Good morning, your Honor.  Colin
Sampson and Erin Cornell for the United States.

**THE COURT:**  Good morning.

**MR. OSTERHOUDT:**  Good morning, your Honor.  William
Osterhoudt and Frank Moore on behalf of Mr. Morgovsky.

**THE COURT:**  Good morning.  Good morning,
Mr. Morgovsky.

**THE DEFENDANT:**  Good morning.

**MR. MAZER:**  Good morning, your Honor.  Richard Mazer
for Irina Morgovsky, who is personally present.

**THE COURT:**  Good morning.  Good morning,
Mrs. Morgovsky.

I wanted to just get together today to talk about jury
selection and trial schedule and stuff like that to make sure
we have all our ducks in a row.

I think that I probably should have arranged to have
jurors pre-screened for availability, given the potential

length of the trial, but I did not do that in time.  So I wanted to talk about, in light of that -- in light of the fact that I didn't do that, I wanted to talk about how and when to do jury selection.

But in any event, right now we're scheduled to start on June 13th and I wanted to see if the government had a little bit better of an estimate of how long it thought its case would take.

MR. SAMPSON:  Yes, your Honor.  We have been working on estimating the amount of trial time and we filed the Witness List the other day.  It has a number of witnesses.

THE COURT:  Let me pull that up.  Hold on a second.

MR. SAMPSON:  Yes, sir.

(Brief pause.)

THE COURT:  Okay.  So it looks like we have 63 witnesses listed on here.

MR. SAMPSON:  Your Honor, there are -- sorry.  Go ahead.

THE COURT:  A lot of custodians and whatnot, but at least 45 witnesses who are not merely custodians or sort of clean-up witnesses, it looks like; is that right?

MR. SAMPSON:  That's about correct, your Honor.  About in the thirties, if you exclude the -- some of the search warrant finders, who would, if absent a stipulation, testify that they participated in a search and found certain items and

documents.

So potentially 20 custodians or people with a chain of custody would be testifying.  I've proposed stipulations.

I talked to Mr. Osterhoudt about it last night and we're optimistic that the defense will stipulate to a large number of documents in a way that will obviate the need to call certain bank and shipping and other custodians.

THE COURT:  Okay.  So, and what is your current estimate of how long your case will take?

MR. SAMPSON:  It continues to be ten court days, including the opening.  If you -- if you say the openings are half of a court day, then that gives us about 47-and-a-half hours.

Your Honor, the Government's *will calls*, the witnesses the government definitely will call at trial, we estimate to be about 32 hours of testimony, including reasonable cross examination.

And then the *may call* witnesses are another 18 to 20 hours.

THE COURT:  And what -- so let's go -- so let's go through these witnesses.

MR. SAMPSON:  Yes, sir.

THE COURT:  Let's go through your *will call* witnesses.  Why don't you tell me what they are going to testify about?

MR. SAMPSON:  Number one, Robert Amenta.  He will testify about the international wires that were received by the defendants from international sources over a six-year period.  He's a *will call* and he's 30 minutes.

THE COURT:  And when you say "30 minutes," you're estimating the amount of time it would take both for direct and cross examination?

MR. SAMPSON:  I believe so, your Honor.  I think he's 20 to 25 minutes by the Government.  It's just one to two exhibits and a background about the world financial system.

THE COURT:  Okay.

MR. SAMPSON:  And I believe a short amount of cross.

Thomas Andrukonis or Orestes Theocharides, one of the two, depending on a health issue, will testify.  That's *a will call* from the Department of Commerce.  I estimate that to be approximately one hour.

THE COURT:  And they --

MR. SAMPSON:  They will testify, your Honor, about the export administration regulations, the EAR.  That's what commerce controls.

We've charged ITAR violations, but there are also what are known as commerce violations, and this witness is important to testify about the difference between being licensed for commerce export, which is known as dual use export, and ITAR.

THE COURT:  You said you've charged ITAR violations

and not commerce vices.

MR. SAMPSON:  That's correct.

THE COURT:  Can you explain to me a little bit more about why we need somebody to come testify about the commerce violations.

MR. SAMPSON:  Because a potential defense is that the Defendant thought he was complying with commerce regulations and accidentally violated ITAR.  We wanted to prove that that's not the case.

THE COURT:  Okay.

MR. SAMPSON:  Your Honor Kobi Bukai is *a will call*. We believe it's two hours.  Tactical Light Solutions.  That is a company that sold a moderate amount of control products to Hitek, which is the Morgovsky's company.

Todd Carr is *a will call*.  Three hours --

THE COURT:  Curious why you think -- why you think two hours would be needed for Bukai.

MR. SAMPSON:  Your Honor, I think that that is a generous estimate.

THE COURT:  What are the -- what's the dispute about? Like, what are they going to contest about -- what's he going to testify?  Is he going to testify that he sold this stuff to them?

MR. SAMPSON:  Yes, your Honor.  There's approximately 15 exhibits that are invoices.  He also had a decent number of

emails with Mr. Morgovsky.  So he can testify about times that he's met Mr. Morgovsky, communications he's had.

I believe he's also been cc'd on emails involving Mrs. Morgovsky.  He will testify about those.

It's probably not a two-hour witness, but I wanted to be a little more generous with the sellers of night vision.

THE COURT:  Right.  But what do you expect to be contested regarding that testimony?

MR. SAMPSON:  I'm not sure, your Honor.  I don't believe it's controversial testimony, but this is an individual who's in the Bay Area.  I believe he has met Mr. Morgovsky a number of times.  I have had not had the opportunity to meet with him yet.

THE COURT:  Okay.

MR. SAMPSON:  Todd Carr, your Honor, Department of Defense.  He will testify about the United States Munitions List, about the International Traffic and Arms Regulations, and whether the night vision devices that were -- the Government alleges were exported to Russia are on ITAR.

THE COURT:  Is that going to be -- is that disputed?

MR. SAMPSON:  I -- I believe that the Defendants have filed documents discussing how difficult and complex ITAR is and how difficult it is to apply and whether or not it applied to certain night vision items.  So I believe it might be.

THE COURT:  Okay.  And what's your time estimate for

this person?

        **MR. SAMPSON:**  I estimated three hours, your Honor.

        **THE COURT:**  For Carr?

        **MR. SAMPSON:**  Yes.

        **THE COURT:**  Okay.

        **MR. SAMPSON:**  Your Honor, I annotated the Witness List this morning, and I'm happy to share that with the Court and with counsel.  It has the amount of time.

        **THE COURT:**  That's fine, but I would also like to go through it.

        **MR. SAMPSON:**  Of course.

    (Whereupon document was tendered to the Court.)

        **MR. SAMPSON:**  Your Honor, next Steven Cobb and Billy Cox.  Those are both Customs and Border Protection employees.

    One of them, we believe -- they are *may call* witnesses, depending on a possible stipulation.  We think that they are short witnesses, 15 minutes each.

    One will testify about a 2001 incident in which Mr. Morgovsky was cited with an ITAR violation when he entered the United States with a controlled scope.

    The other will testify about the 2008 arrest of Mr. Morgovsky when he returned to the United States from Russia using the deceased Joseph Fradel passport, which led to his charge with that crime.

        **THE COURT:**  Okay.

MR. SAMPSON:  Roy Echtermeijer, your Honor.  This individual is in the Netherlands.  He is a *may call*.  We believe he's a two-hour witness.  He had numerous communications with Mr. Morgovsky.  Mr. Morgovsky asked him to receive packages on his behalf --

THE COURT:  Who did you say he was?

MR. SAMPSON:  Sorry.  Seven, Roy Echtermeijer.

THE COURT:  But who -- you said he's in the Netherlands?

MR. SAMPSON:  He's in the Netherlands.

THE COURT:  Who is he?

MR. SAMPSON:  He's Juro Trading.  Juro Trading is a company that received shipments from Hitek International and possibly VisionTech, but from the Morgovskys.

He met Mr. Morgovsky at a night vision trade show and Mr. Morgovsky asked him to hold packages for him as he was traveling through Europe and, also, forward packages to Mr. Morvogsky's mail drop in Germany.

THE COURT:  Okay.

MR. SAMPSON:  Leila Freeman, your Honor.  That's Mark Migdal's secretary.  She was involved in the repackaging and sending of a number of boxes to a freight forwarder for shipment to Moscow.  We believe she's a short witness, 30 minutes.

Leonid --

THE COURT:  Mark Migdal's secretary?

MR. SAMPSON:  Yes.

THE COURT:  Okay.

MR. SAMPSON:  Leonid, Len, Gaber.  He's a *may call* --
oh, your Honor, let me go through the *will calls*.  I'm sorry.

Rocky Green is *a will call*.  He's approximately a
30-minute witness.  Rocky Green was contacted by Irina
Morgovsky, who was looking for night vision products.  He
reported that contact to the FBI.

THE COURT:  Okay.

MR. SAMPSON:  William, Bill, Grube.  He is from a
night vision seller.  He is *a will call*.  He's approximately
two hours.  I believe he is Night Vision Depot.

And he -- again, to your Honor's point, I don't know that
the testimony is controversial, other than that there is a long
email exchange between Mr. Grube and Mr. Morgovsky about their
differing interpretations of ITAR.  That's important for
willfulness.  There are also a number of invoices.

THE COURT:  Okay.  So Grube was somebody who sold --
who you alleged sold night vision goggles to the Morgovskys?

MR. SAMPSON:  Image intensifier tubes, your Honor,
yes.

THE COURT:  Okay.

MR. SAMPSON:  Catherine Hamilton, Department of
State.  She will testify about the International Traffic and

Arms Regulations from the State Department perspective.

The U.S. Munitions List is promulgated by DOD.  State Department implements the regulations.  We think she's a one-hour witness.  She's *a will call*.

THE COURT:  Is there a need -- why do you need to call somebody from Department of Defense, who you estimate will testify for three hours, and somebody from the Department of State, who you estimate will testify for one hour?

MR. SAMPSON:  Your Honor, frankly, this is -- these are witnesses that Mr. McCullough of the National Security Division is prepping.

I don't have all the insight into his planned examination, but I do believe that we consider her to be an important witness, both for discussing the applicability of ITAR to the items that were purchased, as well as the lack of a license or lack of an application for a license by Mr. Morgovsky.  And only the State Department can testify about the licensing.

THE COURT:  Okay.  It strikes me some of this testimony is potentially duplicative, but, obviously, I'm not in a position to know that now.  I'm just trying to get a bird's eye view of your case and get a sense of how long it's going to take.

MR. SAMPSON:  Your point is well taken.

THE COURT:  Okay.

MR. SAMPSON:  Scott Henry, your Honor, is *a will*

*call.*  He used to work with -- I believe he used to work with

Mr. Morgovsky at Hitek.  And I believe he also worked at ATN,

which is Mrs. Morgovsky's son's night vision company.

>           THE COURT:  Okay.  And what's the -- so the subject

of --

>           MR. SAMPSON:  It's a bit of background, your Honor.

Mr. Morgovsky's involvement in the business.  The fact that

Hitek is an actual going concern.  Shut down.  He discusses the

late 90's, I think, through the early 2000s.

>           THE COURT:  Okay.

>           MR. SAMPSON:  Your Honor, Joe Hora is *a will call.*

He's in Chicago.  He leased a space to Mr. Morgovsky and --

except he thought Mr. Morgovsky was Gary Piper.  He has met

Gary Piper and Gary Piper's wife.  He will identify them.

>           THE COURT:  Okay.  Any reason that would take an

hour?

>           MR. SAMPSON:  There may be a bit of background about

Mr. Morvogsky's lease of this storage space in Chicago.

Statements Mr. Morgovsky made.  But he may not -- I'm sorry,

your Honor.  I estimated him to be an hour.  He is traveling

from out of state.

I mean, I'm not going to waste the jury's time.  I

estimated an hour to be safe.  He might be 30.

>           THE COURT:  Okay.

>           MR. SAMPSON:  Mike Kendrick, number 18, your Honor.

This is an individual at Harris Corporation.  This individual opened the three night vision scopes that were seized from the Morgovskys residence in the search warrant.  He then confirmed that the serial numbers matched products which were sold to, I believe, Night Vision Depot.  Those serial numbers track back to purchases that Hitek International made.

We think that that is a 90-minute witness, your Honor, because he has -- he can testify about these pinnacle tubes, otherwise known as image intensifier tubes; how Harris Corporation manufactures them, considers them to be controlled; issued ITAR warnings on them; does not sell to people who are shipping -- who don't have -- who are shipping internationally. And will testify about his -- the technical aspects of his examination of these physical tubes.

        THE COURT:  Okay.

        MR. SAMPSON:  K.C. Khorami, your Honor.  That's *a will call*, one hour.  That is a freight forwarder that the Morgovskys used to ship items to Russia.

        THE COURT:  And why -- why would that take an hour?

        MR. SAMPSON:  It might, again, being conservative and allowing for cross, your Honor.  There are maybe just a few shipments at the most.  There may only be two.

So there's only a few invoices and some communications back and forth.  He may not take that long.

        THE COURT:  Okay.

MR. SAMPSON:  Greg, Georgiy, Kulya.  That's *a will call*, your Honor.  We think that's a 15-minute witness.

That witness will testify that he owns a business called City Best Construction Management and that he doesn't know why the Morgovskys opened a bank accounts in the name of his business.

THE COURT:  Okay.

MR. SAMPSON:  Bank of America Dulce Marroquin, your Honor.  That's a *will call*.  That's the only bank witness that's a definite *will call*.

We estimate that to be an hour because -- although we do want to stipulate to a number of bank exhibits, we think it's important that the jury does hear from -- from a bank employee about what it takes to open a bank account, what -- you know, who's authorized to sign, signature cards, what bank statements say.  I think an hour at most.

And there are, approximately, 50 or more Bank of America exhibits.  There are on number of Bank of America accounts.  So we may present some of those.

THE COURT:  Okay.

MR. SAMPSON:  Vsevolod Mazo, your Honor, is *a will call*.  We think that's a four-hour witness.  That includes a very decent amount of cross, which we anticipate.

Mr. Mazo -- Dr. Mazo is the individual in Germany.  He has a cooperation agreement with the Government.  He will return to

the United States and testify about his involvement in
forwarding packages to Moscow for the Morgovskys.

        **THE COURT:**  Okay.

        **MR. SAMPSON:**  Kili Mesner, your Honor, Harris
Corporation, *will call*.  She has the insight at Harris
Corporation, which, again, is the maker of the vast majority of
the products that the Morgovskys were buying into their ITAR
designations, the requirements for Export Statements of
Understanding, which buyers of control technology have to send
in order to receive these products.

    I estimate her --

        **THE COURT:**  Is there not duplication between Mesner
from Harris Corporation and Kendrick from Harris Corporation?

        **MR. SAMPSON:**  I understand the concern about
duplication, your Honor.  I -- I think that Kili Mesner could
only be a 30-minute witness.

    We will avoid duplication, but -- but Mr. Kendrick is more
the engineer who assembles and disassembles scopes, and Kili is
an ITAR individual with knowledge.

        **THE COURT:**  Okay.

        **MR. SAMPSON:**  Your Honor, the next, Ian Mitchell,
IRS, *will call*.  That's approximately one hour.

    He participated in the search of Avondale, which is the
Morgovskys residence, and interviewed Mr. Morgovsky.  He will
testify about what Mr. Morgovsky told him.

Either Windy or Dave Newbro, your Honor, one of the two. They are a couple.  They run Morovision Night Vision. Morovision sold a vast amount of night -- controlled night vision to the Morgovskys.  Both Morgovskys signed the Export Statements of Understanding.

We think that's 90 minutes between the two of them.  We anticipate calling one and not both.

**THE COURT:**  Okay.

**MR. SAMPSON:**  Tim Olson, your Honor, of Janos Corporation, one hour, *will call*.  Janos manufactures night vision that is infrared lenses.  These are the other controlled components which the Government alleges the Morgovskys purchased and exported to Russia without a license.

So there is the image intensifier tubes and then there is the Janos lenses.  So like Harris Corp. but a different product.  And they will talk about their manufacture, their sale.  They sold directly to Mr. Morgovsky.  There is also email communications involved.

**THE COURT:**  Okay.

**MR. SAMPSON:**  Andrew Schook, your Honor, one hour, split up over -- we believe the efficient presentation of evidence is going to require that he be called twice.  That's because he's a summary -- he's not only a search warrant finder at the storage locker, he's also a summary witness who will summarize under Rule 1006 aspects of this case that are

voluminous.

Namely, Mr. Schook will be testifying about the aggregate
night vision purchases and the banking -- not the banking.  I'm
sorry, the shipments.  The numerous shipments via UPS, FedEx,
DHL.  He's a 1006 witness.

MR. OSTERHOUDT:  I'm sorry to interrupt, but these
are -- these are shipments -- there will be evidence of these,
correct?

MR. SAMPSON:  Yes.  There will be voluminous evidence
of shipments from multiple means through multiple
intermediaries.  And we believe that Rule 1006 calls -- it
calls for a 1006 witness to summarize voluminous evidence for
the jury.

THE COURT:  Okay.

MR. OSTERHOUDT:  I agree, as long as it's not another
argument.  It doesn't dissolve into that.

MR. SAMPSON:  Understood.

Alec Shkoda.  He's a *will call*, Auto Export Group.  That's
a Los Angeles-based freight forwarder.  We estimate one hour.

There is one large shipment.  I think it's 28 boxes that
go to Moscow with Aeroflot.  That's -- Leila Freeman was
involved in sending them to Auto Export Group.  Auto Export
then sent to Moscow.

Now, Mr. Morgovsky communicated with them not as
Mr. Morgovsky, but as Sergey Solesnyak (phonetic spelling),

using Sergey Solesnyak's account.  So we think that that will take about an hour.

        **THE COURT:**  What you described sounds pretty simple.

        **MR. SAMPSON:**  It may well be.  We will try to be efficient, your Honor.

        **THE COURT:**  Okay.

        **MR. SAMPSON:**  So Josephus van Seeters, your Honor.  That's IDSS, International Defense and Securities Solutions.  He's in Leesburg, Virginia.

    Your Honor, he is another seller of night vision -- well, actually, he did not actually sell night vision to the Morgovskys, but the -- Mr. Morgovsky, I believe, on behalf of either Hitek or AIT engaged with him about a possible joint venture, sent Mr. van Seeters a number of brochures, which the Government alleges are fake brochures, using Infratech's, the Russian company's, night vision scopes, sort of a dummy or decoy, to pretend that the business was assembling in the United States.  We think that's a one-hour witness.

        **THE COURT:**  Okay.

        **MR. SAMPSON:**  Dawn Wilkes is a *will call*, your Honor.  Dawn Wilkes is a postal inspector.  She will testify about the USPS shipments that the Morgovskys made, as well as the international shipments, schema of how things are shipped.  What is a way bill?  What is -- you know, what are the commerce conditions under which things are shipped?  What are the

customs, duties?  What forms do you have to fill out,
et cetera.  We think she's a 45-minute witness.

Dustin Wen, your Honor, is a summary witness.  He's an FBI
financial analyst.  He will testify about the approximately
$10 million in international bank wires that the Morgovsky's
accounts received.

THE COURT:  Okay.

MR. SAMPSON:  Your Honor, Google and Yahoo are very
limited.  One might be at most 30, one might be 15 to 30.

We will probably only call one of them to testify about
the creation of an email account, the registration of an email
account and what kinds of things you find in an email account,
and what kinds of data is reported, like, the IP addresses,
and, you know, whether the IP -- the IP addresses are in the
U.S. or Russia, and lay the foundation for the Government's
email evidence.

THE COURT:  Sounds like an overestimate to allot an
hour and 15 minutes to that.

MR. SAMPSON:  I can talk very quickly, your Honor.
Yeah, I understand.  We think it could be shorter.  We will try
to keep it shorter.  That said, I think we're still within this
ten-day window.

UPS, United Parcel Service, that's a *will call*, your
Honor.  Like I said about Bank of America, we think it's
important to have a private or express shipper testify briefly,

for possibly 45 minutes, about the UPS shipments the Morgovskys
made and how shipments are made.

That might dovetail or coincide with someone from the UPS
Store.  Apparently, they are different entities that have to be
served.  The UPS Store, an Updates Store witness will -- and I
will get a name as soon as I can, will testify about the
Morgovskys use of numerous postal drops in the Bay Area.

**THE COURT:**  Okay.

**MR. SAMPSON:**  Your Honor, then there is the search
warrant finders.  I listed them all as *may call*, except for
Penni Price.  She's the Regional Forensic Laboratory witness.

Now, we have proposed a stipulation, but even with a
stipulation, it may be necessary just to call a witness to talk
about aspects of files, like the metadata, the creation date,
creator, author, modified date, what an MD5 hash is, and the
fact that she imaged the Government's digital received from one
MacBook pro seized from their residence.

So we don't think it's a very long witness, but it is
technical, so I built in some time.

**THE COURT:**  Okay.

**MR. SAMPSON:**  Your Honor, California Employment
Development Department, we have some certified lack of records,
documents, indicating that the Morgovsky's various companies
never filed returns or paid tax.  That's important because the
Government's allegation -- and this coincides somewhat with

what our response will be to the Defendant's opposition of
404(b) -- is that the Morgovsky's companies were merely shells.
They were not actually going concerns after 2003 or so.  They
never had their own offices or employees.  Never filed tax
returns.  They were not for any intents and purposes real, and
that's because Morgovsky's goal was to accomplish an illegal
act.  That's at most 30 minutes.

> **THE COURT:**  Okay.

> **MR. SAMPSON:**  That's it for the *will calls*, your
Honor.

> **THE COURT:**  Okay.  Let me ask the Defense what -- in
terms of time frame for the trial, what are you thinking at
this point?

> **MR. OSTERHOUDT:**  Well, your Honor, the -- we have
been trying to agree on stipulations, and we are making
progress on that.  I think that's going to be accomplished and
will shorten it.

As far as the Government's estimate goes, I don't know if
it fully takes into account the number of individual exhibits
that may require -- may require inquiry.  We have a lot of
email correspondence.  We have various other documents that may
take some time.

The only reason I'm saying that, your Honor, is that it
could lengthen it somewhat, although we will try to keep it
within that -- that -- we don't want to lengthen the trial and

that's why we have been discussing stipulations.

But we do have 997 exhibits here and we've got a new list or a modified list, I think, yesterday or the day before.  And so we are trying to keep track of those and go over those and be ready to address those.  It could take some time as the trial progresses, but we will do the best we can to keep it within that limit.

THE COURT:  Okay.  Mr. Mazer, anything to add to that?

MR. MAZER:  I think Mr. Osterhoudt is speaking for both of us --

THE COURT:  Okay.

MR. MAZER:  -- on this.

THE COURT:  Okay.

MR. SAMPSON:  Your Honor, it's approximately 725 exhibits.  We have a lot of gaps, for logical purposes, so that we can slot things in.  The Defense has had a version of our Exhibit List for about five weeks.

On the -- we are working on stipulations.  That may resolve 400 exhibits.  And then there are -- there's an alleged tranche of exhibits that are translated from Russian.  We do anticipate possibly having to call one or more Russian trained -- FBI witnesses who are Russian speakers and did the translations.  That could potentially -- I'm not sure how to facilitate the most efficient way to get that testimony in, but

we're working on that.

      **THE COURT:**  Well, and that sounds like the kind of thing that, you know, in almost all instances could probably be stipulated to, right?  Translations of documents.

      **MR. OSTERHOUDT:**  We just received what's called final translations of some documents and we're still going through those.

      So we do the best we can to not lengthen the procedure. There are already issues that concern these exhibits, as the case goes on, that will take some examination.

      So I'm not disagreeing with the Government's time estimate.  I'm just saying it could be optimistic, but not by too far.

      **THE COURT:**  It sounds a little conservative to me. I mean, a number of these witnesses, it seems to me, are -- you know, more time is allotted to them than could reasonably be needed given what they are testifying about.

      I mean, so maybe you're right, that more time needs to be taken on some documents that, perhaps, the Government is anticipating, but it also seems like the Government is conservatively estimating the amount of time it would take; that is to say, overestimating the amount of time that it would take to go through some of these witnesses who seem like they are providing testimony on fairly simple things that aren't subject to dispute.

**MR. OSTERHOUDT:**  Some are, your Honor.  Some of the exhibits are multi pages and do invite inquiry.  And the witnesses is conservative in some case; other cases may require some more.

We're still working on that.  We're through the Exhibit Lists and Witness Lists.  We will do the best we can to not extend these examinations any more than necessary.  But that's all I can tell the Court, is I think that whether they're conservative or not, I'm not sure right now, but I think that we will definitely do all we can to avoid delay.

**THE COURT:**  And what, if anything, can you say about the Defense case and the amount of time that that might take?

**MR. OSTERHOUDT:**  As we've gotten closer to trial, I think I've seen the wisdom of the Court's -- the Court's ruling regarding exhibits; that they are not owned by a party, but they are really -- the exhibits aren't designated as Defense or Government's.  And we -- some of the things that we would have put in the or relied upon are in the Government's Exhibit List, and some of the witnesses also.

So at this time I'm not able to say an additional period of independent Defense evidence.  Of course, we're reviewing that and we'll keep you advised.

**THE COURT:**  Okay.  Fair enough.

All right.  So now let's look at the calendar and let's talk about how to do jury selection.

So we are scheduled to begin the trial on June 13th, and so the -- the assumption, if the Government's assumption of ten trial days is correct, which, again, sounds like the Government is being, you know, conservative, you're talking about Wednesday the 13th, Friday the 15th, and then the four days during the week of the 18th and the four days during the week of the 25th; right?

      **MR. SAMPSON:**  Correct, your Honor.

      **THE COURT:**  Okay.

    (Discussion held off the record between the Court and the Courtroom Deputy.)

      **THE COURT:**  Anyway, we could -- okay, let me -- hold on a second.

    (Brief pause.)

      **THE COURT:**  You know, I would like to be able to tell the jury, you know, to anticipate -- I mean, obviously, don't make any promises to the jury, but I -- I would like to be able to tell the jury that we estimate that the case will go to them by the end of June; that we won't be bleeding over into July.

    And so I'm trying to see if I can build in a little extra time by maybe having one trial day on  -- having a trial day on Thursday, on a Thursday.

      **THE CLERK:**  I was going to suggest maybe the 21st. So that way we have the 14th open, but then block the 21st and then have the 28th open.

**THE COURT:**  Is the 28th the day that the City Attorney folks are supposed to come?  I think we tentatively -- yeah, I think we tentatively set the 28th for that.

Well, we don't need to decide now, but -- which day it's going to be but we will probably have -- at least one of those Thursdays we'll probably use for trial.  When it gets a little bit closer, we'll figure it out.

**MR. SAMPSON:**  Your Honor, and that would mean potentially that on Friday, the 29th, closings would occur.

**THE COURT:**  My guess is that closings will begin before then, based on what I've heard.

But that's -- that's what I would anticipate telling the jury, is that we -- you know, they should plan on their entire June being taken up with trial and the case -- we estimate -- no promises, but we estimate the case will go to them at the end of June.  And so what I would -- so does that sound reasonable?

**MR. OSTERHOUDT:**  At this point, your Honor, we -- that's hopeful.  We hope so, yes.

**MR. SAMPSON:**  Yes, your Honor.

**THE COURT:**  Okay.  So then let's talk about how to do jury selection.

Like I said, given the summer -- given that we're in the summer months and given that it's a three-weeks trial, I would have liked to time qualify them, but, apparently, it's too late

to do that.

So what I would propose we do is something that I usually don't like doing, but I think we should do in this case, which is have a two-day jury selection process.  The first day we will call a bunch of people in to the jury office.  We'll have them fill out a questionnaire.  The questionnaire will ask about their availability as well as, you know, questions about, you know, their ability to be a fair juror and whatnot.  And we'll send them home and we will spend the afternoon going through those questionnaires and deciding who can be excused based on the questionnaires and who we should call back in for voir dire the next day.  And then -- and we'll call them back in, call people back in for voir dire the next day.

I would anticipate -- I mean, you all may have more experience in these -- in cases like this.  I can virtually assure you that you have more experience in cases like this than I do.

You know, off the top of my head, I was thinking of calling like -- having 100 jurors fill out the questionnaires, with the -- and I was thinking that we would have -- I don't know if 14 or 16 jurors.  I was thinking maybe 16.  And that calling in 100 prospective jurors would likely -- would almost certainly get us the 16 that we need.

Anybody have a gut reaction to that?

          MR. OSTERHOUDT:  The amounts sounds fine, your Honor.

Is it your custom to -- is it your policy to just choose everybody without designating alternates or do you choose the alternates as alternates?

      THE COURT:  The last four -- the way I typically do it is the last two people or last four people are the alternates.

      MR. OSTERHOUDT:  And they know that?

      THE COURT:  And they know that.

      MR. MAZER:  One other thing that may affect the length of the trial is that we are going to file our reply motion for severance, for a separate trial for Irina.  I think it's on the 23rd.  May 23rd, I think, is the filing date.

      THE COURT:  You're filing a motion on the 23rd?

      MR. MAZER:  It's the reply.

      THE COURT:  Okay.

      MR. MAZER:  We made the motion.  The Government has made their opposition and now we're going to file the reply.

      THE COURT:  Okay.

      MR. MAZER:  And so -- and so that, if that motion is granted --

      THE COURT:  I assume we would discuss that on the 30th at the pretrial conference, okay?

      MR. MAZER:  Yeah, okay.  That will shorten, I think, the length of the trial somewhat.

      THE COURT:  Yeah.  I mean, as you know, this -- you

know, this is an issue -- these are issues about who should be tried in which cases and severance and what should be tried together and what should be tried separately.

This is a matter that I've given quite a bit of thought and I would be very surprised if I granted that motion based on what I know now, but, obviously, I haven't read it yet and I will consider it.

**MR. MAZER:**  Understood.

**THE COURT:**  Okay.  So then -- so then when -- so that jury selection process should we -- oh, no.  I was going to propose -- I was going to propose that we have them do the questionnaires on Friday the 8th, but I see that I -- that we can't do that because I won't be here.

Should we just have them do the -- I guess we should just have them do the questionnaires on the 11th and then do voir dire on the 12th.

And, Kristen, were we planning on  -- we are going to have no CMC calendar that day?

**THE CLERK:**  Right.  Criminal will be at 3:00.

**THE COURT:**  Criminal will be at 3:00, okay.  We may also want to -- we can discuss this offline, but we may also -- for the subsequent weeks, we may want to consider moving the CMC calendar from those Tuesdays to those Thursdays, like, in the afternoon.

Okay.  So why don't we do that?  The jurors will come in

around 8:00 or 8:30, fill out the questionnaires.  I expect you

all will get copies of the questionnaires around noon or

something like that.

It's not a big fire drill since we're not doing it the

same day.  And then we should probably all plan on meeting at

around 2:00.

Does that sound about right?

  **MR. OSTERHOUDT:**  On which day?

  **THE COURT:**  On the 11th.

  **MR. OSTERHOUDT:**  Okay.

  **THE COURT:**  To go through the questionnaires together

and decide who we can excuse on the papers.  And then we will

meet at 8:30 on the 12th to do voir dire.

And voir dire, I will largely let the lawyers handle voir

dire.  I will impose time limits.  We'll see how many jurors

we're calling in.  You know, I'm guessing maybe 45 minutes per

side, you know, something along those lines for voir dire.

But I'll largely let the lawyers handle it.  I'll sort of

start off with my -- you know, with a few questions and

comments, but I'll leave it largely to the lawyers.

  **MR. OSTERHOUDT:**  Thank you, your Honor.

  **THE COURT:**  And then I guess -- I mean, we could do

openings on Tuesday, but I -- I guess -- I kind of like letting

the jurors have the afternoon to get their -- get their affairs

in order before the trial starts.  So we will just plan on

doing openings on Wednesday morning as scheduled.

Okay.  Anything else for us to discuss right now?

**MR. OSTERHOUDT:**  I don't think so, your Honor.

**MR. SAMPSON:**  Not until the conference.  Thank you, your Honor.

**THE COURT:**  Good.  See you then.

**MR. OSTERHOUDT:**  Thank you very much.

**THE COURT:**  Thank you.

(Proceedings adjourned.)

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, May 23, 2018